UNITED STATES v. SOUTHERN PAC. R. CO. et al.

(Circuit Court, S. D. California.  June, 27, 1898.)

1. PUBLIC LANDS — CANCELLATION OF PATENTS UNDER RAILROAD GRANT — RIGHTS OF PURCHASERS IN GOOD FAITH.

In a suit by the United States under Act March 3, 1887 (24 Stat. 556), to annul patents issued to a railroad company for lands, and the certification of other lands not yet patented, to which certain purchasers from the company were made defendants, a decree was entered canceling the patents and certifications, but saving the rights of the purchasers under the act, which provided that purchasers in good faith from the grantee, who were citizens of the United States, or had declared their intention to become such, should, on proper proof before the land department, be entitled to patents, for the lands so purchased.  An appeal was pending in the supreme court when Act March 2, 1896 (29 Stat. 42), was passed, confirming the titles of all bona fide purchasers from patentees under railroad grants.  The decree was affirmed, "subject, however, to the right of the government to proceed in the circuit court to a final decree" as to the purchasers defendant.  *Held*, that the later act was applicable to such purchasers of lands for which patents had issued to the railroad company, whose titles were thereby confirmed, and would be recognized by the final decree, on proof that their purchases were made in good faith, without regard to the question of citizenship.

2. SAME—CITIZENSHIP OF PURCHASER.

As to land, however, which had been certified but not patented to the railroad company, the government was entitled to a decree quieting its title as against purchasers not shown by the evidence to be citizens, or to have declared their intention to become citizens.

3. SAME—PURCHASER FROM ALIEN GRANTEE.

That the first grantee of a railroad company of lands erroneously certified under a grant is an alien will not deprive a subsequent grantee, who is a citizen of the United States, of his rights as a bona fide purchaser, under Act March 3, 1887.

4. SAME—BONA FIDE PURCHASER DEFINED.

A bona fide purchaser of lands from a patentee under a railroad grant, within the meaning of act March 2, 1896 (29 Stat. 42), and whose right and title are thereby confirmed, is one who purchased in good faith, for value, expecting to obtain title through the railroad company, though he may have been chargeable, as matter of law, with constructive notice of the invalidity of the patentee's title.

5. SAME—PAYMENT OF PURCHASE MONEY.

The fact that a purchaser of lands patented to a railroad company holds under a contract, and has paid only a portion of the purchase money, does not affect his character as a bona fide purchaser, whose title is protected by Act March 2, 1896 (29 Stat. 42).

6. SAME—OPERATION OF STATUTES—SUBSEQUENT PURCHASERS.

The legislation of congress in relation to bona fide purchasers of lands which have been erroneously certified or patented under railroad grants is remedial in its nature, and the several acts apply to those purchasing after as well as before their passage.

This was a suit in equity by the United States against the Southern Pacific Railroad Company and others to annul the certification and patenting of certain lands to defendant company under grants by congress.  A decree granting the relief prayed for against the company was affirmed by the supreme court.  168 U. S. 1, 18 Sup. Ct. 18. The cause came on for further hearing in this court, on a motion of complainant for further decree as to certain defendants who were purchasers of lands from the railroad company.

The United States Attorney and Joseph H. Call, Special Asst. U. S. Atty., for complainant.

Wm. F. Herrin and Wm. Singer, Jr., for defendants.

ROSS, Circuit Judge. On the 3d day of March, 1887, congress enacted that the secretary of the interior immediately adjust, in accordance with the decisions of the supreme court, each of the railroad land grants, theretofore unadjusted, made by it to aid in the construction of railroads. It directed the secretary of the interior, in the event it should appear, upon the completion of the respective adjustments, or sooner, that lands had been from any cause theretofore erroneously certified or patented by the United States to or for the use or benefit of any company claiming by or through or under grant from the United States to aid in the construction of railroads, to thereupon demand from such company a relinquishment or reconveyance to the United States of all such lands, whether within granted or indemnity limits; and, in the event such company should neglect or fail to so reconvey such lands to the United States within 90 days after the making of the demand, it was made the duty of the attorney general to commence and prosecute, in the proper courts, the necessary proceedings to cancel all patents, certification, or other evidence of title theretofore issued for such lands, and to restore the title thereto to the United States. Among the provisions of the act was also one to the effect that, as to such of the lands so erroneously certified or patented which had theretofore been sold by the grantee company to citizens of the United States, or to persons who had declared their intention to become such citizens, the person or persons so purchasing in good faith, and the heirs or assigns of such person or persons, should be entitled to the land so purchased, upon making proof of the fact of such purchase at the proper land office, within such time and under such rules as should be prescribed by the secretary of the interior, after the respective grants should have been adjusted; and that patents of the United States should issue therefor, and should relate back to the date of the original certification or patenting, and directing the secretary of the interior, on behalf of the United States, to demand payment from the company which had so disposed of such lands, of an amount equal to the government price for similar lands; and, in case of neglect or refusal of such company to make payment as specified in the act within 90 days after the demand, the attorney general was directed to cause suit or suits to be brought against such company for such amount, provided that nothing in the act should prevent any purchaser of lands erroneously withdrawn, certified, or patented from recovering the purchase money therefor from the grantee company, less the amount paid to the United States by such company, as by the act required. Act March 3, 1887 (24 Stat. 556).

On the 17th day of May, 1890, the original bill in this suit was filed by the United States against the Southern Pacific Railroad Company, D. O. Mills, and Gerritt L. Lansing, as the holders of a mortgage or deed of trust from the defendant railroad company upon the lands described in the bill to secure the payment of certain indebtedness of the defendant railroad company to them, as trustees, and the City

Brick Company.   The purpose of the suit was to obtain a decree es-
tablishing and quieting the alleged title of the complainant to the
lands therein described, as against the defendants, and enjoining them
from cutting or removing from the lands any tree or wood.   The
lands constituting the subject of the suit are thus described in the
bill:

"All the sections of land designated by odd numbers in townships 3 and 4
north, ranges 5, 6, and 7 west; township 1 north, ranges 16, 17, and 18 west;
township 6 and the south ¾ of township 7 north, ranges 11, 12, 13, 14, 15,
16, 17, 18, and 19 west; also, all the sections of land designated by odd
numbers, as shown by the public surveys, embraced within the townships
from number 2 north to number 5 north, both inclusive, and ranges from
number 8 west to number 18 west, both inclusive, except sections 23 and
35 in township 4 north, range 15 west, and except sections 1, 11, and 13 in
township 3 north, range 15 west; also, the unsurveyed lands within said
area which will be designated as odd-numbered sections when the public
surveys, according to the laws of the United States, shall be extended over
such townships, all of the aforesaid lands being surveyed by San Bernardino
Base and Meridian, and being situated within the state of California."

The bill alleged, among other things, that the defendant railroad
company illegally and unjustly claimed the lands described under
and by virtue of grants made to it by congress, and further alleged
that, while claiming and pretending to own the lands, by pretended
conveyances executed in due form of law, it pretended to sell and con-
vey large portions thereof, and the wood and timber thereon, to various
persons unknown to the complainant, the names of which purchasers,
together with the dates and amounts of such purchases, and the extent
of whose claims, the complainant asked that the defendants be re-
quired to disclose, and that, when ascertained, such purchasers and
adverse claimants be made parties defendant to the suit.   The defend-
ant railroad company, in its answer to the bill, averred that a large
portion of the lands included in the bill had been theretofore conveyed
to it by patents of the United States duly issued and delivered, and ad-
mitted that it had sold and conveyed its title to a portion of the lands
described in the bill, and annexed to and made a part of its answer
a certain exhibit, designated as "Exhibit B," containing particular de-
scriptions of all of the lands in suit which had been sold by the defend-
ant railroad company prior to the commencement of the suit, includ-
ing the names of the purchasers, the dates of the respective sales, and
the amount for which the lands were sold.   Subsequently, the com-
plainant filed an amended bill, in which the purchasers thus disclosed
were made parties defendant.

Thereafter the cause came on regularly for trial, which resulted in
the entry of a decree on the 19th day of July, 1894, annulling all pat-
ents theretofore issued by the United States to the defendant railroad
company under the grants made to it by congress on July 27, 1866 (14
Stat. 292), and March 3, 1871 (16 Stat. 573), and by any amendatory
or supplemental acts, for any and all of the lands embraced in the
bill, and establishing the title thereto in the complainant, and quieting
the same as against the defendant railroad company and its defendant
mortgagees, but providing that the decree should not "in any wise
affect any right which the defendants, or any of them, other than the
said Southern Pacific Railroad Company, now have or may hereafter

acquire in, to or respecting any of the lands" involved in the suit, by virtue of the adjustment act of March 3, 1887. Upon appeal to the supreme court, the decree was "affirmed in all respects as to the Southern Pacific Railroad Company, as well as to the trustees of the mortgage executed by that company, and affirmed also as to the other defendants, subject, however, to the right of the government to proceed in the circuit court to a final decree as to those defendants." 168 U. S. 1, 66, 18 Sup. Ct. 34. Intermediate the taking of the appeal and the decision thereof by the supreme court, congress passed the act of March 2, 1896 (29 Stat. 42), which not only prescribed periods within which suits to vacate and annul patents theretofore or thereafter issued should be brought, but which also provided that "no patent to any lands held by a bona fide purchaser shall be vacated or annulled, but the right and title of such purchaser is hereby confirmed." After the filing of the mandate of the supreme court herein, and on the 7th day of January, 1898, on motion of counsel for the complainant, further proceedings in the suit against all of the defendants other than the Southern Pacific Railroad Company and its mortgagees were dismissed, without prejudice, as to all the lands described in the bill, except certain specified tracts aggregating 47,945.52 acres of land. In respect to these specific tracts, counsel for the government moved for further decree in accordance with the mandate of the supreme court, which motion has been argued and submitted by counsel for the respective parties, and is now for determination. Some of the specific tracts embraced by the motion have been patented by the United States to the defendant railroad company, and for some of them no patents have been issued. Some of each of these classes of the land now under consideration the defendant railroad company has contracted to sell to individual defendants, executing in each instance an executory contract of sale, and receiving from the purchaser a part of the purchase money. Some, it, in like manner, contracted to sell to a foreign corporation, styled Atlantic & Pacific Fibre & Importing Company, receiving therefrom the purchase money in full, and for some of each class the railroad company has executed deeds to the respective purchasers, having received therefrom the full amount of the purchase money. All of the lands covered by the pending motion are included in one or the other of these classes. Most of the purchasers from the railroad company of the lands under consideration are citizens of the United States, or have declared their intention to become such. One was the foreign corporation mentioned, whose interest in the tracts purchased by it was, however, subsequently assigned and conveyed, for value, to the defendant Graves, also shown to be a citizen of the United States. A few of such purchasers are not shown by the evidence to be citizens, or to have declared their intention to become such.

Enough has been stated to enable the court to indicate to the parties in interest the lines upon which the further decree must proceed, and the reasons therefor. The act of March 2, 1896, put an end to all question in relation to all patents for lands held by a bona fide purchaser from the railroad company, regardless of the citizenship of such purchaser; for it in express terms declares that no such patent shall

be vacated or annulled, and further expressly confirms the right and title of such purchaser. U. S. v. Winona & St. P. R. Co., 165 U. S. 463, 476, 477, 17 Sup. Ct. 368. This act, although passed after the entry of the original decree in this cause in this court, is to be considered and applied. In the case last cited, the supreme court said:

"It is true this act [the act of March 2, 1896] was passed after the commencement of this suit,—indeed, after the decision by the court of appeals,—but it is none the less an act to be considered. There can be no question of the power of congress to terminate, by appropriate legislation, any suit brought to assert simply the rights of the government. This suit was instituted by the attorney general in obedience to the direct command of congress as expressed in the act of 1887, and congress could at any time prior to the final decree in this court direct the withdrawal of such suit; and it accomplishes practically the same result when, by legislation within the unquestioned scope of its powers, it confirms in the defendants the title to the property which it was the purpose of the suit to recover. So, if this act of 1896, taken by itself alone, or in conjunction with preceding legislation, operates to confirm the title apparently conveyed by the certification to the state for the benefit of the railroad company, that necessarily terminates this suit adversely to the government, and compels an affirmance of the decisions of the lower courts without the necessity of any inquiry into the reasons advanced by those courts for their conclusions. We are of the opinion that congress intended by the sentence we have quoted from the act of 1896 to confirm the title which in this case passed by certification to the state. It not only declares that no patents to any lands held by a bona fide purchaser shall be vacated or annulled, but it confirms the right and title of such purchasers. Given a bona fide purchaser, his right and title is confirmed, and no suit can be maintained at the instance of the government to disturb it."

The supreme court, in its opinion in the present case, held that the effect of the decree heretofore entered herein was to leave undetermined the question whether the defendants who claimed under the Southern Pacific Railroad Company are protected by the act of March 3, 1887 (24 Stat. 556), "or any other act of congress"; and its decree of affirmance was made subject to the right of the government to proceed in this court to a final decree as to those defendants. 168 U. S. 66, 18 Sup. Ct. 34. This is the construction which the supreme court has in this case put upon the decree heretofore entered herein, and by which this court must, of course, be governed. The government has elected to proceed to a final decree herein as to the claims of those defendants in respect to certain specified tracts of the lands embraced by its original bill, and, on motion of its counsel, has dismissed, without prejudice, further proceedings against the defendants other than the Southern Pacific Railroad Company, D. O. Mills, and G. L. Lansing, trustees, as to the balance of the lands. For such of the lands embraced by the present proceeding as have been patented by the United States and been purchased by the defendants in good faith and for value, the latter are entitled to a decree against the complainant, and confirming their title; for congress has by its act of March 2, 1896, declared that no such patent shall be vacated or annulled, and has expressly confirmed the right and title of such purchasers. That act, although passed after the entry of the decree herein of July 19, 1894, is applicable to the present status of the case, and is to be given effect. It was so expressly held by the supreme court in its opinion in this very case, as well as in the Winona Case, above re-

ferred to. In providing, therefore, as must be done in the further decree now to be entered, in order to prevent an otherwise apparent inconsistency, that the decree of July 19, 1894, shall not be construed to enjoin the defendant bona fide purchasers of such of the lands now before the court as have been patented by the United States from asserting title thereto, the court is but carrying out the decision of the supreme court in the present case, and giving effect to its mandate.

Nor is the character of the defendants as "bona fide purchasers" to be tested by the meaning of that term as ordinarily understood in equitable proceedings. In the case just cited, the supreme court said:

"It is earnestly contended by the government that the present holders of the title are not 'bona fide purchasers'; that that term has a fixed and well-defined meaning, as announced in the frequent decisions of this and other courts; that, as said in 2 Pom. Eq. Jur. § 745, 'the essential elements which constitute a bona fide purchaser are therefore three,—a valuable consideration, the absence of notice, and presence of good faith' (U. S. v. California & O. Land Co., 148 U. S. 31, 42, 13 Sup. Ct. 458); that while two of these essential elements may be found, to wit, a valuable consideration, and the presence of good faith, the third—the absence of notice—is lacking; that all men are conclusively presumed to know the law, and that, as the true rule of construction in reference to these grants was laid down by this court, the purchasers were bound to know such true rule; that the records of the land office disclose the existence of these homestead entries and pre-emption filings, and therefore they who purchased from the railroad company knew, or at least were chargeable with knowledge, of the fact that those lands could not rightfully have been certified to the railroad company, but were excepted from the terms of grant, and in fact remained the property of the government. It is further insisted that as congress, in this statute, used this well-understood expression, it intended only the protection of such parties as came within the scope of this settled meaning. It is said that the only cases to be covered by this provision were those in which the state or the railroad company, by presentation to the land office, before the filing of the map of definite location, of a forged relinquishment by the pre-emptor, or one having made a homestead entry, or by some other fraudulent representations, secured a certification or patent to the tracts, and thereafter sold and conveyed to one who purchased in ignorance of the fraud.

"We are unable to agree with this contention of counsel, for several reasons: In the first place, the situation as it was known to exist makes against any such narrow construction. While instances of such fraudulent conduct on the part of the state to which the lands were certified, or the company to which the lands were patented, might exist, yet, in the nature of things, they would be few, and hardly worth the special notice of congress; while, on the other hand, the fact that there had been a difference between the land department and the courts, one construction obtaining in the former prior to the decisions by the latter, and the further fact that, by this difference of construction, many tracts had been erroneously certified or patented, must have been well known to congress, and naturally, therefore, a subject for its legislation. Further, there was no need of any legislation to protect a 'bona fide purchaser.' This had been settled by repeated decisions of this court. U. S. v. Burlington & M. R. R. Co., 98 U. S. 334, 342; Colorado Coal & Iron Co. v. U. S., 123 U. S. 307, 313, 8 Sup. Ct. 131, reaffirmed in U. S. v. California & O. Land Co., 148 U. S. 31, 41, 13 Sup. Ct. 458. For in each of those cases it was decided that although a patent was fraudulently and wrongfully obtained from the government, if the land conveyed was within the jurisdiction of the land department, the title of a bona fide purchaser from the patentee could not be disturbed by the government; so that this provision was absolutely unnecessary if that which is now claimed by counsel for the government is all that was intended by congress. We do not mean to assert that, because legislation to cover such a contingency was unnecessary, therefore the language used by congress necessarily implies something other

and different, because, of course, it may have been that congress intended nothing but a simple declaration of the law as it was known to exist. At the same time, the fact that under one construction it was needless raises a presumption that something more was intended, and that congress had in view the protection of other parties than were already protected by general law.

"But we need not rest on these inferences and presumptions. Other provisions of the acts of 1887 and 1896 make clear the intent of congress. Section 3 of the act of 1887 provides that, if the homestead or pre-emption entry of any bona fide settler has been erroneously canceled on account of any railroad grant, it may be reinstated, provided he has not located another claim, or made an entry in lieu of the one so canceled, and also did not voluntarily abandon such entry. By this section, congress provided for the reinstating of the title of one deprived thereof by an erroneous ruling of the land department, but, at the same time, limited the right of reinstating to cases in which the original entryman had not voluntarily abandoned his entry, or had not since that time made a new entry. In other words, it was limiting the restoration of the title of the original entryman to cases in which he had a continuing and present equitable right to recognition. As to all other cases, congress reserved the determination of the equities between the government, the railroad company, and purchasers from the latter, and in subsequent sections it made provision for the adjustment of such equities. Section 4 of the same act, expressly referring to all other lands erroneously certified or patented to any railroad company, provides that citizens who had purchased such lands in good faith should be entitled to the lands so purchased, and to patents therefor issuing directly from the United States, and that the only remedy of the government should be an action against the railroad company for the government price of similar lands. It will be observed that this protection is not granted to simply 'bona fide purchasers' (using that term in the technical sense), but to those who have one of the elements declared to be essential to a bona fide purchaser, to wit, good faith. It matters not what constructive notice may be chargeable to such a purchaser if, in actual ignorance of any defect in the railroad company's title, and in reliance upon the action of the government in the apparent transfer of title by certification or patent, he has made an honest purchase of the lands. The plain intent of this section is to secure him the lands, and to re-enforce his defective title by a direct patent from the United States, and to leave to the government a simple claim for money against the railroad company. It will be observed that the technical term 'bona fide purchaser' is not found in this section; and while it is provided that a mortgage or pledge shall not be considered a sale, so as to entitle a mortgagee or pledgee to the benefit of the act, it does secure to every one who in good faith has made an absolute purchase from a railroad company, protection to his title, irrespective of any errors or mistakes in the certification or patent. Section 5 of the same act applies to cases in which no certification or patent has issued, and yet the lands sold by the railroad company are the numbered sections prescribed in its grant, and coterminous with the constructed portions of its road; and it is there provided that, where the lands so sold by the company 'are for any reason excepted from the operation of the grant to said company,' the purchaser may obtain title directly from the government by paying to it the ordinary government price of such lands. It is true, the term used here is 'bona fide purchaser'; but it is a bona fide purchaser from the company, and the description given of the lands, as not conveyed and 'for any reason excepted from the operation of the grant,' indicates that the fact of notice of defective title was not to be considered fatal to the right. Congress attempted to protect an honest transaction between a purchaser and a railroad company, even in the absence of a certification or patent. These being the provisions of the act of 1887, the act of 1896, confirming the right and title of a bona fide purchaser, and providing that the patent to his lands should not be vacated or annulled, must be held to include one who, if not in the fullest sense a 'bona fide purchaser,' has, nevertheless, purchased in good faith from the railroad company."

What was here said by the supreme court also disposes, adversely to it, of the contention made on behalf of the complainant to the effect that the purchasers from the defendant railroad company were bound to know the law, and were therefore to be charged with knowledge that the true construction of the grants made by congress to the Atlantic & Pacific Railroad Company and the defendant railroad company, respectively, excluded from the latter all lands at any time embraced by the former.

From the evidence in the case, it does not admit of doubt that the respective purchasers of the land now under consideration bought in good faith, and in the expectation of receiving, through the railroad company, title to the lands purchased. This is shown in part by the contracts and deeds introduced in evidence. That in many instances only a part of the purchase money has been actually paid is, in my opinion, wholly immaterial. As was well said by the secretary of the interior in the recent case of Schneider v. Linkswiller and others, decided March 18, 1898, a copy of whose opinion has been presented with the briefs:

"It is a part of the history of the times that the land-grant companies had sold much of the land within the limits of the grants to immigrants and others, and held out, as inducements to such parties, contracts giving long credit, and requiring moderate annual payments. It was through this policy that vast bodies of land in the public land states were disposed of to actual settlers, and many communities established and built up. This was well known to congress at the time of the passage of said act, and it seems certain that such contracts, whether spoken of as sales or purchases, whether fully performed or only partially performed, constitute a part of the subject with which congress was dealing, and the rights of the so-called 'purchaser' thereunder are within the protection of the statute, if acquired in good faith. If there be any doubt about the correctness of this view of the purpose and intent of the act of 1887, it is removed by a perusal of the amendment thereto of February 12, 1896 (29 Stat. 6), wherein congress expressly recognizes partly performed contracts of purchase, like that of Schneider, as constituting a purchase within the meaning of the law."

I am also of opinion that the legislation of congress under consideration is not to be limited to purchasers who bought prior to the respective enactments. The legislation is remedial in its nature, and therefore to be liberally construed. Attorney General Garland, in an opinion given by him in response to certain questions propounded respecting the act of 1887, said:

"The whole scope of the law, from the second to the sixth section, inclusive, is remedial. Its intent is to relieve from loss settlers and bona fide purchasers, who, through the erroneous or wrongful disposition of the lands in the grants, by the officers of the government or by the railroads, have lost their rights or acquired equities, which in justice should be recognized. * * * The whole remedial part of the law was passed with the recognition of the fact that the railroad companies had sold lands to which they had no just claims."

The adjustment directed and provided for, of the various grants, necessarily required time, and a great deal of it. Until adjusted and settled, the conflicting claims of the government, on the one side, and of the railroad companies and the purchasers from them, on the other, continued. Every such purchaser who bought for value, and in the

honest belief that he would thereby acquire through the grantee company the government title to the land so purchased, is, in my opinion, entitled to the benefit of this remedial legislation, regardless of the date of his purchase, provided he possesses the necessary qualification in respect to citizenship. And this view is in accord with the rulings of the secretary of the interior. Instructions of Secretary Noble to the Commissioner of the General Land Office, August 30, 1890, 11 Land Dec. Dep. Int. 229; Sethman v. Clise, 17 Land Dec. Dep. Int. 311; Andrus v. Blach, 22 Land Dec. Dep. Int. 241. As against such of the defendant purchasers as have failed to prove their citizenship or intention to acquire citizenship, the complainant is entitled to a decree quieting its title. The defendant Graves is shown by the evidence to be a citizen of the United States, and to have purchased, for value, those of the lands in controversy claimed by him which have not been patented; but his immediate grantor, who was the purchaser from the railroad company, was a foreign corporation, and therefore not entitled to the benefits of the act of March 3, 1887. The secretary of the interior has held in several cases that if the applicant is a bona fide purchaser, and himself possesses the requisite qualifications as to citizenship, it is immaterial whether the original purchaser from the railroad company, through whom he claims, was a citizen, or had declared his intention to become such. Instructions and Decisions of the Secretary of the Interior, supra. In view of the nature of the legislation in question, and of the liberal rule of construction that should be accorded it, I am not prepared to differ from the construction thus adopted by the officers of the land department, especially in view of the amendatory and supplemental act of congress of March 2, 1896, under which, as has been seen, bona fide purchasers for value of such lands as have been patented to the railroad companies by the United States are confirmed in their purchases, even though they be aliens. A further decree will be entered in the case in accordance with the views above expressed.